Argued July 7, reversed September 8, rehearing denied October 20, 1925.

## M. S. RAMP AND M. S. RAMP, AS GUARDIAN AD LITEM FOR ROBERT MALCOLM RAMP AND NELLIE RAMP, *v.* E. G. OSBORNE, HOMER ROSS AND OREGON RUBBER COMPANY.

(239 Pac. 112.)

**Evidence—Evidence of Speed Four or Five Miles from Place of Accident not Admissible.**

1. In an action involving an auto collision, evidence of defendant's speed four or five miles from place of collision is inadmissible as not necessarily proving negligence of defendant at particular place involved.

**Highways—Application for Dealer's License Plate not Evidence of Ownership of Particular Car.**

2. Evidence of application of dealer for license plate is not competent to prove ownership by dealer of a particular car; Laws of 1921, page 718, Section 4, not making such plate evidence of property in any car.

**Trial—Defendant's Requested Instruction Concerning Sale of Car Prior to Accident Should have Been Given.**

3. In an action for damages from an auto collision, defendant's requested instruction that, if his understanding with driver of car prior to accident was that latter had title, it would constitute a sale, though purchase price was not paid, should have been given to

the jury, under rule that a party has a right to have a legitimate theory presented to jury, if it can be derived from the testimony.

**Master and Servant—Instruction Agent cannot Represent Two Persons Properly Refused.**

4. In an action for negligence of agent in driving an automobile colliding with automobile in which plaintiffs were riding, a requested instruction that agent could not act for both defendants at same time, where he was selling car for one and taking orders for tires for the other, was properly refused, since interests did not conflict in the operation of his agency.

**Master and Servant—Company Retaining No Authority Over Means of Travel of Agent Taking Orders not Liable for His Negligence.**

5. In an action for damages for negligence of defendants' agent in driving a car, where evidence showed that agent was hired to solicit orders, but company retained no authority as to where or how he should travel, the defendant's motion for nonsuit should have been granted.

**Highways—Failure of Driver to Look to Right at Intersection, as Required by Statute, was Negligence Per Se.**

6. Failure of a driver at a road intersection, to "look out for and give right of way to vehicles on the right," as required by Laws of 1921, page 710, Section 2, subdivision 7, was negligence *per se.*

**Highways—Plaintiff's Failure to Look to Right, as Required by Statute, Held Contributory Negligence.**

7. Negligence of defendant in approaching at an unlawful rate of speed does not excuse plaintiff from looking to the right at road intersection, as required by Laws of 1921, page 710, Section 2, subdivision 7, where, by doing so, he could have seen the defendant, and his failure to do so was contributory negligence, preventing his recovery.

**Highways—Instructions Concerning Crossing of Intersection by One not Having Right of Way Erroneous as Omitting Duty to Look to Right.**

8. In an action for damages through an automobile collision, an instruction that, if one not having right of precedence at a crossing sees no one within a dangerous distance, he may cross, was erroneous as ignoring duty to look to right, required by Code.

**Highways—Driver, not Having Right of Way, cannot Assume That Speeding Car Will Slow Down at Crossing.**

9. A driver, not having the right of way, who sees a car approaching at a negligent rate of speed, cannot assume that it will slow down at crossing, and he cannot recover for a resulting injury, where he attempts to cross first.

---

7.  See 2 R. C. L. 1184, 1185.

115 Or.—43

Highways—Instruction Concerning Right of Car on Left to Cross-road Where It is Closest to Intersection Regardless of Speed of Car on Right Erroneous.

10. In an action for damages through an auto collision, instruction that car on left may cross first, if it is closest to intersection, regardless whether car on right is traveling at unlawful rate of speed, was erroneous, since it directs jury to disregard any condition of driver of car on left contributing to his own injury.

Highways—Evidence Held to Show Prima Facie Case of Ownership by Defendant of Car.

11. In an action involving auto collision, where driver of car was negotiating to buy it from defendant, defendant's testimony that, if it had been attached on road, he would have claimed it as his own, was sufficient to make a *prima facie* case of ownership of car by defendant.

See (1) 28 Cyc. 47. (2) 28 Cyc. 47. (3) 28 Cyc. 49; 38 Cyc. 1626. (4) 26 Cyc. 1519 (Anno.); 28 Cyc. 49. (5) 28 Cyc. 38. (6) 28 Cyc. 37. (7) 28 Cyc. 37. (8) 28 Cyc. 49. (9) 28 Cyc. 37. (10) 28 Cyc. 49. (11) 28 Cyc. 47.

From Marion: PERCY R. KELLY, Judge.

Department 1.

REVERSED. REHEARING DENIED.

For appellant Homer Ross there was a brief over the names of *Mr. R. L. Conner, Messrs. Malarkey, Seabrook & Dibble* and *Messrs. McNary, McNary & Keyes,* with oral arguments by *Mr. Arthur M. Dibble* and *Mr. R. L. Conner.*

For appellant Oregon Rubber Company there was a brief over the name of *Messrs. Joseph, Haney & Littlefield,* with oral arguments by *Mr. Arthur M. Dibble* and *Mr. R. L. Conner.*

For respondents there was a brief and oral arguments by *Mr. W. C. Winslow* and *Mr. Roy F. Shields.*

BURNETT, J.—On July 2, 1921, M. S. Ramp, accompanied by his wife, Nellie Ramp and their minor son, Robert Malcolm Ramp, was driving a

Ford automobile in which they were riding eastward along a road leading from Brooks in Marion County approximately at right angles across the Pacific Highway, leading northerly from Salem toward Portland. At the intersection of the two roads a collision ensued between the automobile so driven by M. S. Ramp and a Pierce-Arrow car driven north on the highway by the defendant E. G. Osborne. As a result of the collision Ramp and his wife and child were all injured. Each of the three brought a separate action against the defendant Osborne, joining with him the defendants Ross and the Oregon Rubber Company, averring in substance that the defendants negligently operated the Pierce-Arrow car at a careless and reckless rate of speed in excess of fifty miles per hour, carelessly and neligently failed to keep a proper lookout or any lookout for the safety of the traveling public and carelessly and negligently failed to watch where they were driving said car, and while thus carelessly and negligently operating said car, ran into plaintiff's automobile, demolishing the same, threw out the plaintiff, to his injury, in each case. In each case, the negligence is charged in practically the same language. The resulting injuries are of course different in each instance. The corporate character of the defendant Oregon Rubber Company is admitted in each answer. Otherwise all the complaints are traversed. The defendant Osborne added to his denials a plea imputing to the plaintiff M. S. Ramp contributory negligence, retorting in that respect in practically the same terms employed in the complaint. Likewise Osborne averred a counterclaim against M. S. Ramp for damages accruing to the former by virtue of the collision. By agreement at the trial the defense of contributory

negligence as against M. S. Ramp was adopted by
Ross and the Rubber Company as their own, was
considered applicable to them as well as to Osborne
and was deemed traversed by the reply. No further
notice need be taken of the answers of Osborne, as
affecting him, because he has not appealed from the
adverse judgments. On stipulation of the parties
all three actions were tried together before the same
jury in the Circuit Court, with the result that each
plaintiff obtained a verdict for damages against all
the defendants. From the ensuing three judgments
the defendants Homer Ross and Oregon Rubber Com-
pany have appealed.

The assignments of error in a large part are
identical as to each appellant. In substance, the
theory of the plaintiffs in all the cases was that the
defendant Osborne was driving the Pierce-Arrow
car and was guilty of negligence in so doing, to the
damage of the plaintiffs, and further, that at the
time Osborne was the servant of both the other de-
fendants, rendering them responsible for his tort
under the familiar doctrine of *respondeat superior.*

1. One of the assignments of error is the action of
the court in permitting a witness to testify for the
plaintiff over the objection of the defendants that
at a point four or five miles south of the place of
the accident a car which the witness identified as the
Pierce-Arrow involved in the collision was seen
going at a speed of forty-five miles an hour. In
*Wade* v. *City Ry. Co.*, 36 Or. 311 (59 Pac. 875), such
evidence was held inadmissible. The question is the
negligence of the offending party at the time and
place of the accident. It does not necessarily follow
that a defendant is negligent at the critical time and
place because he was negligent at some other place

and at a different time.   As well might the defendant put in testimony that at all other times and places he was extremely careful in the operation of the car.   In *Flynn* v. *Lewis,* 231 Mass. 550 (121 N. E. 493, 2 A. L. R. 896), the court held that it was not permissible to show that on the forenoon of the day in the afternoon of which the accident happened the chauffeur drove fast.   See, also, *Cooney* v. *Commonwealth Ave. Street R. Co.,* 196 Mass. 11 (81 N. E. 905).   As said by Mr. Justice BIGELOW in *Robinson* v. *Fitchburg etc. R. R. Co.,* 7 Gray (Mass.), 92, 95:

"Evidence of specific acts of negligence and carelessness on the part of the engineer, in running trains on other occasions than the one in question, was clearly incompetent.   It would not only lead to collateral inquiries, and so distract and mislead the jury from the true issue before them, but it had no legal or logical tendency to prove the point in issue. Because a man was careless or negligent of his duty in one or two specified instances, it does not follow that he was so at another time and under different circumstances."

See, also, *City of Salem* v. *Webster,* 192 Ill. 369 (61 N. E. 323); *Dalton* v. *Chicago Ry. Co.,* 114 Iowa, 257 (86 N. W. 272); *Christensen* v. *Union Trunk Line,* 6 Wash. 75 (32 Pac. 1018); *Oklahoma Ry. Co.* v. *Thomas,* 63 Okl. 219 (164 Pac. 120, L. R. A. 1917E, 405).

2. For the purpose of imputing ownership of the car in question to the defendant Ross, plaintiffs offered a certified copy of an application of Ross for a dealer's license plate and another application made by Osborne for a duplicate set of such plates, the others having been lost.   It was not shown that Osborne had any authority from Ross to make such

an application. Neither was it shown that either
the original dealer's license plates or the duplicates
were attached to the car driven by Osborne at the
time of the accident. The statute does not make a
dealer's license plate evidence of property in any
car. No particular car is described in an application
for such plates, and they are attached indiscrimi-
nately to any car the dealer owns when he is demon-
strating it for the purpose of sale. The court, it is
true, restricted their operation to the purpose of
identifying the number of the dealer's license plates
issued to Ross. This, however, was not material
testimony upon the issue of whether Ross owned the
car involved in the accident or not. The effect and
purpose of dealer's license plates are prescribed in
Section 4 of Chapter 371 of the Laws of 1921, that
being the statute in force at the time of the acci-
dent.

3. As developed in the testimony, the theory of the
plaintiffs as against the defendant Ross was that he
had employed the defendant Osborne to take the
car which Osborne was driving and sell it for the
account of Ross and that he was engaged in that un-
dertaking at the time of the accident. On the other
hand the theory of Ross was, that while it is true
that about a month before the accident he had en-
trusted the car to Osborne to be sold by him, yet
he was limited in his driving to take it only to
Eugene, Oregon, and there sell it; that having failed
to sell the car at that place, Osborne asked permis-
sion of Ross to drive the car to Portland for the
purpose of taking out the family of Osborne for a
holiday trip on the Fourth of July; that Ross refused
permission for that purpose, whereupon Osborne
said to him in a telephone conversation, that unless

he sold it in Salem he would take the car himself
on the terms under which Ross had entrusted the
car to Osborne, and to this Ross assented, with the
understanding that the car should be paid for later.
In that connection Ross requested the following in-
struction to the jury:

"If you find from the evidence that defendant,
Ross, had sold the automobile driven by defendant,
Osborne, to defendant prior to the accident, then your
verdict should be for the defendant Ross. In this
connection I instruct you, that if defendants, Ross
and Osborne, had an understanding that the title to
said automobile passed from defendant, Ross, prior
to the accident, for which defendant, Osborne, was
to pay defendant, Ross, at a later date, this would
constitute a sale, even though the purchase price was
not paid."

Instead of giving all this instruction, the court only
gave the first sentence thereof. The car being in
the possession of Osborne at the time, the case did
not fall within the statute of frauds requiring a
memorandum in writing unless the' delivery of the
property involved or some part thereof was made.
It was quite competent for Ross to sell the car under
such circumstances to Osborne on credit, and if that
was the real intention of the parties in good faith
and the intent was thereby to pass the title to Os-
borne it would exonerate Ross from the consequences
of any subsequent collision. Ross was not bound
by the terms of the offer which he had instructed
Osborne to make to other parties of half cash and
the balance to be secured by a conditional sales note.
It was the privilege of Ross to give more favorable
or different terms to Osborne and to sell it to him
on credit. The question should have been left to the
jury on that theory under the well-known rule that

a litigant has the right to have a legitimate theory, presented to the jury in the instructions, if the same can be derived from the testimony.

4. Ross insisted on an instruction to the effect that Osborne could not at the same time be the servant of Ross and the other defendant, the Oregon Rubber Company. It is quite possible for a man to be the agent of more than one party at the same time. Of course, he cannot at the same time represent two persons whose interests conflict in the operation of his agency, at least not without the knowledge and consent of both of them. But there is nothing in the testimony indicating that the alleged agency of Osborne for both parties in any way conflicts with this rule. It seems that Osborne was engaged in taking orders for automobile tires which he submitted to the defendant Oregon Rubber Company. This was not in any way inconsistent with his alleged duty to sell a car for the account of Ross. The instruction asked by Ross on that point was properly refused.

5. At the close of the testimony for the plaintiff the defendant Rubber Company moved for judgment of nonsuit on the ground that the plaintiffs had not proven a case sufficient to be submitted to the jury. The evidence relied upon by the plaintiffs to charge the Rubber Company with the negligence of Osborne in bringing about the collision was that prior to the accident, Osborne took orders as a traveling salesman for the sale and delivery of tires and that the Oregon Rubber Company shipped them to the firms giving the orders. In addition to this the plaintiff Ramp testified that after the accident he interviewed an official of the Rubber Company about the relation

between the company and Osborne. The testimony is here quoted:

"Q. All right; I want to ask you what the representative there of the Oregon Rubber Co. said regarding the manner of transportation of Mr. Osborne, and general reference to his employment by them? A. He said that there was no specific agreement as to how Osborne was to get his transportation, that was up to him, that he was paid a salary, and that was up to him, and he furnish his own transportation. Q. Who paid the expense of the transportation? A. The company."

Concerning the same conversation R. R. Wesley testified thus:

"Q. You remember the statement made by Mr. Armund of the Oregon Rubber Co. with reference to Mr. Osborne's traveling around the country—means of transportation? A. Yes, he said he had traveled on trains and I think he stated that—I am not sure whether he said but I think he said he didn't know at this time that the man was traveling in the automobile, or something to that effect. Q. What did he say about paying his traveling expenses and leaving it to him, what did he say as to the manner, who selected—

"Mr. Littlefield: Now—

"Q. What did he say about who selected the manner of travel of Osborne? A. I think that was left optional with Osborne. Q. What did he say about who paid the expenses of that transportation? A. Why, I think he said the Oregon Rubber Co. paid the expenses."

The utmost that is shown by this testimony is that Osborne was in a situation analogous to that of a contractor. All he was employed to do was to solicit orders for tires. The Rubber Company retained no authority to direct his movements as to when he should travel, where he should go or how he should

go. So far as that is concerned he might have conducted the business of his employment by correspondence exclusively. A case cited by the plaintiffs is *Goldsmith* v. *Chesbrough,* 138 Md. 1 (113 Atl. 285). In that case Goldsmith was a merchant who employed one Talbot to solicit orders for merchandise within a certain district and to collect the pay for the goods. During the time that he was thus engaged, Talbot used his own automobile without authority or direction of Goldsmith, and in so doing injured the plaintiff. The Court of Appeals of Maryland held that this was not sufficient evidence to be submitted to a jury so as to charge Goldsmith. In discussing the question, Mr. Justice PATTISON quoted from *Wilson* v. *Pennsylvania R. R. Co.,* 63 N. J. Law, 385 (43 Atl. 894), thus:

"The plaintiff was struck by a wagon belonging to the Adams Express Company, driven by a person employed by the Pennsylvania Railroad Company to carry United States mail, which was, in fact, in the wagon, but which previously had been carried on foot or in a pushcart. Held, that as there was no proof that the defendant had authorized its servant to use a wagon, the plaintiff should have been nonsuited."

Further, the case of *Stretton* v. *City of Toronto,* 13 Ont. Rep. 139, was discussed. In that instance the plaintiff was knocked down and severely injured by the negligent driving by one Bessey of a horse and buggy. This horse and buggy did not belong to the defendant, but were the private property of Mr. Coatsworth, the city commissioner. Bessey was a servant of the defendant. A hydrant had burst, and Foley, also a servant of the defendant, who was attending to it, sent Bessey to his (Foley's) house for a wrench. Bessey, on his way there, without the knowledge or authority of Foley, and without

the knowledge or authority of Coatsworth, took the horse and buggy, which he found standing in front of Coatsworth's office, for the purpose of more speedily getting the wrench, and in driving for it ran down plaintiff. The court said:

"The defendants were sought to be charged for the negligent driving by Bessey, their servant, of a horse and buggy, causing injury to the plaintiff, and in order to establish this it was necessary for the plaintiff to show that the driving of the horse and buggy was in the course of Bessey's employment as the servant of the defendants. This he failed to do. Bessey, it is true, was the servant of the defendants, and in going for the wrench was acting in the course of his employment; but he was not acting in the course of his employment in going for it with a horse and buggy which he had wrongfully possessed himself of without the knowledge or consent of the defendants, and they were consequently not liable for his negligent driving of this horse and buggy."

Again, the court in the Goldsmith case referred to the *St. Louis, I. M. & S. Ry. Co.* v. *Robinson,* 117 Ark. 37 (173 S. W. 822), in which the plaintiff was injured by being run into or struck with a bicycle, ridden by a call-boy in the employ of the railway company. It was his duty to call the different train crews as directed, there being three or four of them to be called each day. The division foreman, on the morning of the injury, directed him to call certain crews, and while on his way to do this the injury was inflicted. The boy was not employed to perform his services on a bicycle nor provided with or required to have one. The court said:

"The defendant railway company 'did not furnish a bicycle for his use in the service, nor require him to provide one therefor, and the duties imposed upon him to notify the other employees did not necessitate

such dispatch in reaching them as required the use of a bicycle. It was employed by the caller to facilitate the performance of his duties mayhap, and certainly for his own convenience, and the mere fact that the agents of the railway company knew that the call-boy was using the instrumentality in the performance of his service was not an implied authorization of the use thereof by the master nor sufficient evidence of the necessity therefor. If the service required of the call-boy could not have been performed in the time given therefor without the aid of the instrumentality used (the bicycle), it would have occasioned a necessity, and the knowledge by the agent of such use in the performance of the service would have amounted to an implied authorization thereof, making the railroad liable for a negligent injury therefor.' "

Here, as stated, the Rubber Company retained no direction or authority as to the means of transportation to be employed by the solicitor, and that matter was left entirely to his own discretion. The arrangement only contemplated results and not the means of accomplishing them. It is not pretended that the Rubber Company owned any interest in the automobile driven by Osborne, nor that it directed him to employ that means of transportation nor to travel in any particular way.

The cases cited by the plaintiffs in support of their contention against the Rubber Company are those where a mere servant was engaged in performing a specific act under the direction of the defendant. For instance, in *Dalrymple* v. *Covey Motor Car Co.,* 66 Or. 533 (135 Pac. 91, 48 L. R. A. (N. S.) 424), the defendant company as part of a contract of sale of a car to a person directed its instructor employed for that purpose to drive the purchaser's car out of town, and during the performance of that work

specially directed by defendant, the accident happened. In *Singer Mfg. Co.* v. *Rahn*, 132 U. S. 518 (33 L. Ed. 440, 10 Sup. Ct. Rep. 175, see, also, Rose's U. S. Notes), the company furnished the vehicle by which the injury was committed and retained the right to direct the movements of its driver. In *Foster* v. *Rinz*, 202 Mich. 601 (168 N. W. 420), one defendant, the employer of the other, directed the latter to take his car and convey the former's wife to a car line. The collision occurred while the driver was returning from performing that duty to his place of employment from whence he had started. This was a case where the employer directed the use of the very vehicle that inflicted the injury. In *Doherty* v. *Hazelwood Co.*, 90 Or. 475 (175 Pac. 849, 177 Pac. 432), the defendant's employee as part of his employment used the car of the defendant in the prosecution of the business for which he was employed so had apparent authority while he was in charge of it. In *Holmboe* v. *Morgan*, 69 Or. 395 (138 Pac. 1084), the defendant Howard was a dealer in automobiles. His employee was in charge of a car under the defendant's direction instructing a proposed purchaser from Howard how to operate it and allowed the purchaser to drive it in a crowded street whereby the accident happened. *Houston* v. *Keats Auto Co.*, 85 Or. 125 (166 Pac. 531), was another case where a man was demonstrating defendant's car to a prospective purchaser introduced to him by the defendants during which the accident occurred. *Buick Auto Co.* v. *Weaver* (Tex. Civ.), 163 S. W. 594, was another demonstrating case. In *Lewis* v. *National Cash Register Co.*, 84 N. J. Law, 598 (87 Atl. 345), the driver of an auto was subject to directions of defendant in the conduct of his employment, was

at the time actually engaged in its service, the use of the car was sanctioned by the defendant and it was necessary for the prosecution of the business. In *Gordner* v. *St. Louis Screw Co.,* 201 Mo. App. 349 (210 S. W. 930), the defendant's employee owned an automobile which defendant kept in repair and supplied with oil and gasoline and which with its knowledge and acquiescence was used in the actual prosecution of its business. The employee was transporting castings in the auto from one of defendant's plants to the other, in the course of which his car collided with defendant's wagon and caused the injury. Those cases are clearly distinguished from one like the present where the defendant retained no authority or direction over the manner in which the work was to be performed, but only expected results without regard to details. The motion for nonsuit made by the Rubber Company should have been allowed as against all the plaintiffs.

Respondent, M. S. Ramp, gave the testimony hereafter quoted:

"A. Well, when we left Brooks we drove out to the highway, and there was some one behind me on a motorcycle, I presume the fellow I sold the gas to, and when I got just about to the highway he acted like he wanted to pass me probably, and I kept to my righthand side of the road; and just before you get to the cross-roads there is a house on the south corner, and I always look up that way when I come to that house, for a clear vision, at least 200 yards, and there wasn't anything in sight— Q. Just a minute; when you were in that position you could look up the highway—do you mean toward Salem? A. Yes, sir. Q. How far were you at the time from the highway—and by the 'Highway' I refer to the pavement? A. Why, I was around 110 or 112 feet. Q. All right; how fast were

you traveling at the time? A. Well, not over fifteen miles an hour at the most. Q. All right; when you looked south what did you do? A. Well, there is a house on the north corner, on the northwest corner; before I got to that I observed a machine coming up the road; I could see it dodging in a little brush. Q. Now, up the road—from the north? A. From the north. Q. How far away from the intersection was that machine? A. When I saw it? Q. Yes, when you first saw it? A. Oh, I would think about 150 feet—or yards. Q. All right; now what did you do? A. I went on and I kept watching that side, the machine that was coming from the north, and before I got across the highway, why, I was struck. Q. Now just what position were you on the highway when you were struck? as to which side of the highway, east or west side or in the middle or where were you? A. I was on the east side of Pacific Highway. Q. By that do you refer to the pavement? A. Yes, sir. Q. How near to the pavement were you when the collision actually occurred, when you were struck? A. Well, I don't—I don't think I lacked any more than three feet of being off of it. Q. Mr. Ramp, were you driving at the time of the accident or was your wife driving? I was driving. Q. She was sitting in the front seat of the car with you? A. Yes, sir. Q. Did she caution you about the approach of Osborne's car? A. She did not. Q. She was sitting where she could see it as well as you could? A. Yes, sir. Q. And she said nothing one way or the other? A. She says, 'It is all clear.' Q. Said it was all clear? A. Yes, sir. Q. When did she say that? A. Well, we always looked just as soon as we pass this house, it is on the southwest corner; we always looked especially that way. Q. Then you never looked until you did pass the house? A. No, I could see up there 200 yards. Q. How far is that house from the intersection? A. You mean either to the road or corners of the road? Q. I mean to the center of the intersection. A. Center of the intersection? Q. Yes, from the house that

sits to your right as you come out right near the intersection. A. Well, it is I would say about 125 feet. Q. One hundred and twenty-five feet; to the center of the intersection when you passed the corner of the house, now, there were a lot of maple trees in the yard? A. Along the fence, yes, sir. Q. You could look through the maple trees up the road for 200 yards of the intersection at that time? A. No. Q. You are positive of that? A. I certainly am. Q. And while you were going 125 feet he covered 200 yards and struck your car? A. Yes, sir. * * Q. When was the last time—do I understand you didn't see Osborne from the time he was 200 yards from the intersection until you were struck? A. I never saw him then. Q. How is that? A. I never saw Osborne. Q. But you could look up 200 yards when you passed the house but you couldn't see him then? A. No, sir, I couldn't. Q. You never did see Osborne? A. No, sir, I couldn't. Q. You never did see Osborne? A. No, sir, I never. Q. And as far as you know your wife never saw him? A. No, sir. * * Q. I understood you to say you didn't see the automobile of Osborne until it struck your car, is that right? A. I didn't see it when it struck. Q. You didn't? A. No, sir. Q. Didn't see it at all? A. No, sir. Q. What would prevent you from seeing it? A Well, he came up so quick I didn't see it that is all. Q. You could see down the road two or three hundred yards? A. Yes, sir. Q. But coming so quick you couldn't see it? A. Yes, sir. Q. Which way were you looking at the time? A. Watching the machine that I knew was coming from another direction. Q. But you were looking another direction, is that right? A. I looked just a second or two before the other way. Q. How many seconds before? A. Oh, I don't know, when I was about 110 or 112 feet from the corner. Q. How many seconds did it take you to make that 110 or 112 feet? A. Well, I don't know; I haven't figured that down. Q. But during all that time that you were driving 112 feet you were looking to your left, looking to the north; is that correct? A.

Yes. Q. You didn't look to your right at all during that time? A. Not during that 112 feet. Q. That is what I mean? A. Yes, sir. Q. Which way was your wife looking during that time? A. Well, I don't know. Q. Was she looking to the north, too? A. I said I didn't know. Q. I see; she didn't say anything to you about this car approaching you from the south from your right? A. She did not; she looked at the same time that I did, and says, 'it is all clear.' Q. That is when you were back 115 feet? A. About 110 or 112 feet.''

Respondent, Nellie Ramp, gave the testimony hereafter quoted:

''A. Well, after we left the store and went home, before we got to the corner, the intersection, why, I looked to the right and then to the left and said to Malcolm, 'Everything is clear,' and I could see south on the Highway down the Highway a distance of about two blocks and there was nothing in sight. Q. You refer to Salem blocks, I presume—you were raised in Salem, were you not? A. City blocks, yes. Q. And what was the condition of the road, viewing it from that situation in a southerly direction as to being clear or obstructed by the use of vehicles? A. Nothing was there; everything was perfectly clear? Q. All right; what did you do then? A. Well, we crossed the Highway and were about I should think about three feet from being off of the Highway going east, and I don't know whether the noise of the machine or what but something attracted my attention, and I turned and saw the radiator of a machine, and I screamed, and that is all I know. * * Q. Mrs. Ramp, do you know where the house is that sits in the corner where the maple trees are just to your right before you get to the Highway? A. Yes, sir. Q. Whose house is that? A. You mean on the southwest corner? Q. Yes, southwest corner. A. Blanton's. Q. Now, was it just after you passed that house you looked south and told your husband the way was clear? A. Just

about even with the house or past it a little ways, I looked to the right, then to the left. Q. You had just passed it— A. Yes.. Q. When you looked? A. Yes, sir. Q. And at that time you were between the house and the intersection? A. Yes; I think so, I didn't pay any attention to the house; I watched out and looked through the trees when I looked to the right. Q. As I understand, you had just passed the house when you looked? A. Yes, sir. Q. And you could see, you say, two blocks? A. I could see well the distance of two blocks, I should judge. Q. And no one in sight? A. No, sir. Q. About like two blocks the court house is on? A. Yes, sir.''

6. We remember that Osborne was driving north on the Pacific Highway and Ramp was driving east on the cross-road. That is to say, Osborne was on the right of Ramp approaching a given point which would be the intersection of the two courses on which they were respectively traveling. As applicable to such a situation, subdivision 7 of Section 2 of Chapter 371 of the Laws of 1921, reads thus:

''Drivers, when approaching highway intersections, shall look out for and give right of way to vehicles on their right, simultaneously approaching a given point'';

This is a rule more or less arbitrary, the motive of which is to protect not only the persons immediately operating automobiles, but also the persons who might be affected by the collision, including the general traveling public. The obligation of the rule is constant so long as possible danger of collision exists. The duty to keep a lookout exists at all times while the danger exists. Instead of being intermittent, as the traveler gets nearer the crossing it persists and reaches its climax when he actually crosses the road. Granting that his estimate of distance which he could see south on the highway by

looking across lots and through the trees is correct, fixing it at two hundred yards, yet the plaintiff Ramp could not count upon traffic remaining stationary or in that condition which he then observed until he should get across the track. On the basis of the distance of two hundred yards, a car going at the statutory rate of thirty miles per hour would cover that distance to the intersection in less than a quarter of a minute, or more accurately, in 13 and 7/11 seconds. The plaintiff, M. S. Ramp, testifies that having looked and been informed by his wife that everything was clear in the south he looked no more in that direction before he was struck. He says he never saw Osborne at all. But the statute plainly says he

"shall look out for and give right of way to vehicles on their right."

It is not meant by this that in all cases the driver on the left shall constantly gaze fixedly towards his right. On the other hand, however, it is negligence *per se* for such a driver to look exclusively to the left while in the zone of danger as the plaintiff, M. S. Ramp, said he did in this instance. A lookout to the left is not the equivalent for the statutory lookout to the right. Many times has it been held in this state that a violation of a statute commanding a certain duty is negligence *per se*. *Beaver* v. *Mason, Ehrman & Co.*, 73 Or. 36 (143 Pac. 100); *Cauldwell* v. *Bingham & Shelley Co.*, 84 Or. 257 (155 Pac. 190, 163 Pac. 827); *Myrtle Point Transp. Co.* v. *Port of Coquille River,* 86 Or. 311 (168 Pac. 625). See, also, *Stubbs* v. *Molberget,* 108 Wash. 89 (182 Pac. 936, 6 A. L. R. 318, and note).

7. In that Osborne was traveling at the rate of forty-five miles per hour according to the estimate

of some of the witnesses at the time the collision occurred, he was guilty of negligence because that was in excess of the maximum speed allowed by the statute fixing it at thirty miles per hour. This, however, does not excuse the plaintiff from the performance of the statutory duty imposed upon him. As he entered the boundaries of the highway which is described as being all the way from sixty to one hundred feet wide, traveling as he says at fifteen miles an hour, a single glance to the right would have disclosed the presence of Osborne's car, granting that it was going at the unlawful rate of speed mentioned in the testimony.

Taking the width of the highway at sixty feet, the lowest estimate in the testimony, Ramp was thirty feet from the middle of the highway as he entered it. Traveling at the maximum speed of forty-five miles per hour ascribed to Osborne by any witness, his rate was sixty-six feet per second and that of Ramp, fifteen miles per hour, was one third of that, or twenty-two feet per second. At that proportion, when Ramp was yet thirty feet from the line of danger, the middle of the highway, Osborne was only ninety feet from the middle of the Brooks road. If that road is of the statutory width of sixty feet, as we may presume, Osborne was only sixty feet from its southern margin. At any rate he was plainly visible to Ramp if the latter had looked to the right at any time at or after his entrance upon the western half of the highway. It was his duty to have his car under such control that he could give Osborne his statutory right of way. If Ramp did not have proper control of his car he was negligent. In not looking to the right while in the zone of danger he was negligent, especially as when he entered

the highway, his element of danger, Osborne's car, was only ninety feet distant and rapidly approaching in plain view. We may say that Osborne was greatly negligent in driving so fast, but Ramp cannot justify his own self-confessed negligence by reference to the fault of Osborne. Ramp had no right to gawk into an open, visible danger and expect compensation for the resulting damage. It would be clearly contributory negligence on the part of Ramp heedlessly to drive his car in front of the other machine, albeit the latter was exceeding the speed limit. All the cases cited by the plaintiff Ramp covering such a situation ascribe to the plaintiff a compliance with the statute and careful observance to his right. The obligations of care in such a case are reciprocal. Ramp himself charges as negligence the failure of the defendants to keep a lookout so as to avoid a collision with other cars. The defendants retort in his very language. If it was negligence in the defendants to fail to keep a lookout, it was likewise negligence in Ramp in failing to keep the lookout, especially when the law is specific about the direction in which he should maintain that lookout. He had ample time either to stop his car against the alleged onrush of the other car, or by accelerating his own speed to have kept out of the way of the Osborne machine. It is clear that by inattention to his statutory duty he carelessly placed himself in the path of danger and his negligence contributed directly to his injury, preventing his recovery. Apropos to the duty of the driver of the Ford car is the rule stated in *Vizacchero* v. *Rhode Island Co.*, 26 R. I. 392 (59 Atl. 105, 69 L. R. A. 188):

"It was just as much the duty of plaintiff's intestate to avoid the consequences of the defendant's negligence, if there was any, as for the defendant's servant to avoid the consequences of the intestate's negligence if by any care and foresight he could have done so."

In *Ray* v. *Brannan,* 196 Ala. 113 (72 South. 16), cited by the plaintiffs, the ordinance applicable to the case gave the right of way to vehicles going east or west over those traveling north or south. The court construed it thus:

"It very clearly means that when a vehicle on each of these streets approaches their intersection, visible to each other, at such a time and such a speed as would render their collision imminent if one should not give way to the other, then the vehicle going north or south must, at its peril, be so conducted, circumstances permitting, as to allow the vehicle going east or west to safely pass in front. The conditions of traffic on intersecting streets may reasonably require that such priority be given to one street over another."

After descanting on the reciprocity of the duty of both parties to avoid injuring others and stating that within reasonable limits each may rely on the other's observance of traffic regulations, the court said:

"But this right to expect the observance of specific legal duties by others does not excuse anyone from observing the specific duties imposed by law upon himself; and his failure to do so, if the proximate cause of his injury, would as a matter of law defeat his right of recovery."

Likewise, in *Lindahl* v. *Morse,* 148 Minn. 167 (181 N. W. 323). The matter involved was a crossing accident where the defendant had the right of way. On the trial the plaintiff testified in effect that as he ap-

proached Twenty-Sixth Street he saw the defendant's
car approaching from the right when it was about
forty feet from the intersection, and that it was going
at the rate of about thirty miles an hour, as near
as he could tell.    He testified:

"I was driving; I keep on driving.    I was ahead
of him, so I think I can clear the street before he
did."

The court said:

"Both cars reached the intersection practically at
the same time, the plaintiff's a little ahead.    Plaintiff
saw defendant's car when it was about forty feet
from the intersection.    He made no effort to slacken
his speed.    He thought he could clear the crossing
ahead of defendant's car.    The collision occurred
near the center of the intersection.    The right front
wheel of plaintiff's car struck the left side running
board of defendant's car, which was approaching from
the right, and, under Chapter 119, Section 22, Laws of
1917 (Gen. St. Supp. 1917, § 2552), had the right of
way.    Under the provisions of that statute the plain-
tiff was guilty of contributory negligence as a
matter of law, if his testimony can be relied upon.
Where an operator of an automobile approaching
an intersection under such circumstances undertakes
to cross the same, entirely disregarding the provi-
sions of the statute, and thereby contributes to an
injury, he does so at his peril.    This statute should
be rigidly adhered to as a means of safety to the
traveling public."

*Kinney* v. *King,* 47 Cal. App. 390 (190 Pac. 834),
was a crossing collision between automobiles wherein
the defendant was approaching from the plaintiff's
right.    The ordinance governing the matter provided
that:

"The drivers of all vehicles must look out for and
give right of way to vehicles approaching simulta-
neously from their right at street intersections."

The court said:

"It was therefore the plaintiff's plain duty under such ordinances to give to the defendant the right of way across such intersection, and this duty would be rather intensified than diminished by the fact that the defendant was seen by the plaintiffs traveling at an excessive and illegal rate of speed in making his approach to the point of intersection of these two streets, since the ordinance expressly requires drivers in the plaintiffs' position to 'look out for' such vehicles as were entitled to the right of way."

The court there quoted from the case of *Bullis* v. *Ball,* 98 Wash. 342 (167 Pac. 942), saying in part as follows:

"The purpose of the ordinance giving to vehicles moving in a northerly or southerly direction the right of way at street intersections was to prevent collisions, to obviate the very exigency which here arose. It was foreseen that vehicles approaching street intersections would very probably meet and collide. To prevent this the ordinance above referred to was enacted. Its purpose demands no explanation. It is quite clear. The rights and duties which it creates are equally clear. The driver on the street running north and south must exercise that degree of care which is ordinarily commensurate with the safety and welfare of others with whom he may come in contact at street intersections. But, while it is true that he must exercise ordinary care, the superior right to passage over the intersection is his. It is a right expressly conferred upon him by authoritative enactment, a right which must be observed and respected by others using streets at the points of intersection. This priority of right naturally and necessarily creates a corresponding duty on the part of the traveler using the street running east and west, a duty which consists in the exercise of a degree of care commensurate with the superior

right of the person traveling the street running north and south. The duty necessarily implies that the driver of a vehicle on a street running east and west shall slacken speed for the purpose of observing vehicles approaching the intersection on the street running north and south, and should such vehicle be within a reasonable distance of the intersection, to wait until they have passed before attempting to continue across the intersection. The greater duty and the higher degree of care to be observed in such a situation is upon the person using the easterly and westerly street, if the ordinance in question is to be given any meaning, and any violation of this duty by the person injured which contributes in an appreciable degree to causing the collision in which his injuries are sustained will operate as a bar to his recovery.''

In another automobile crossing case treated in *Jacobson* v. *O'Dette,* 42 R. I. 447 (108 Atl. 653), the driver of the plaintiff's automobile testified that the street was clear and that he was looking ''straight ahead towards Broad Street'' and did not see defendant's automobile until after he heard the crash. The court said:

''Had the driver looked before attempting to cross Westminster Street, he must have seen the defendant's automobile 'coming very fast,' but a short distance from him, in which event it would have been negligence to attempt to cross directly in front of it. The only inference that can be drawn from his conduct in proceeding as he did, without looking in any direction except 'straight ahead,' is that he failed to exercise common prudence. In *Barker* v. *Savage,* 45 N. Y. 191 (6 Am. Rep. 66), the court held that a pedestrian by crossing a street without taking any observations except 'looking straight ahead' was guilty of contributory negligence.''

The court supported this doctrine by a number of precedents and directed the court below to enter a' judgment on the nonsuit.

In *Livingston* v. *Barney*, 62 Colo. 528 (163 Pac. 863), the syllabus reads thus:

"Where an ordinance gave one driving an automobile the right of way across an intersecting street and required him to look to the right, one approaching on the intersecting street on a motorcycle with his view unobstructed, was bound to know that a vehicle on the other street had the right of way and his failure to make an effort to look for an approaching vehicle resulting in a collision, is contributory negligence so proximately connected with the injury complained of that but for such negligence the injury could not have occurred and which will bar recovery."

Likewise in *Yuill* v. *Berryman*, 94 Wash. 458 (162 Pac. 513), the plaintiff had the right of way and recovered a judgment from which the defendant appealed. The court said:

"It was appellant's duty to see and to avoid the respondent. Not having done so, he was clearly negligent. The appellant had a clear view of the respondent for fifteen or twenty feet, or more, before respondent entered upon the intersection of the streets. The respondent, having the right of way, as we have indicated above, it was the appellant's duty to avoid him, which could easily and readily have been done if his car had been under control."

In *Hammond* v. *Emery-Bird Thayer D. G. Co.* (Mo.), 240 S. W. 170, having entered the intersection first, plaintiff had the right of way, but as he saw or could have seen that a collision was imminent on account of defendant's high speed, plaintiff was held guilty as a matter of law of contributory negligence defeating his recovery.

*Rosenau* v. *Peterson,* 147 Minn. 95 (179 N. W. 647), was a similar case.  The court said:

"Defendant was approaching from the right of the driver of plaintiff's car, and under Chapter 119, Section 22, Laws 1917 (Gen. St. Supp. 1917, § 2552), had the right of way, a right plaintiff was bound to respect.

"That the driver of plaintiff's car was guilty of negligence contributing to, if not the real cause of, the collision, seems clear.  She was approaching a dangerous crossing, the view to the north was obstructed, and she was thereby prevented from observing the approach of automobiles or other vehicles from that direction.  She was charged with notice that the law gave those approaching from that direction prior right of passing, and it was her duty to have her automobile in such control as to be in position to check it, and prevent just such a collision as here occurred.  She was unable to do so, and ran directly into defendant's car at the intersection of the traveled part of the road. * * She did not know of the statute giving the prior right of passage to defendant.  But that is no excuse; the law of the road must be respected and upheld, and ignorance thereof will furnish no defense for its violation.  And again, the situation of the crossing, the view to the north being wholly obstructed, was such as to require the driver of an automobile, in approaching the same, to have his car under such control and be in a position to avoid a collision with approaching vehicles, without regard to the question of the statutory priority of right of way. * * The conclusion of negligence on the part of the plaintiff is clear."

Further treating the case the court imputed negligence likewise to the defendant but held against the plaintiff on the ground of contributory negligence.

A Colorado case of *St. Mary's Academy* v. *Newhagen* (Colo.), 238 Pac. 21, decided June 1, 1925, but not yet reported, is instructive on the subject of con-

tributory negligence as here involved. In that instance the plaintiff sought to recover for damage to her automobile caused by a collision with an autobus driven by the defendant. The collision occurred at a road crossing. The defendant's car had the right of way but was going thirty or forty miles an hour. At the crossing it struck the rear of the plaintiff's car and injured it. When about one hundred feet from the crossing the plaintiff saw the defendant's car approaching from the right about four hundred feet away. She saw that the defendant's car was going thirty or forty miles an hour. Fearing danger at the left, because of a building which intercepted her view from that direction, the plaintiff did not look again to the right but continued to look to the left until the car she was driving was struck by the defendant's car. The defendant contended that the plaintiff was not entitled to recover because she was guilty of contributory negligence. The Colorado court held the defendant's contention should be sustained. A driver who has not the right of way is entitled to assume that the car on his right is not approaching at a negligent rate of speed, but where the driver sees a car approaching from his right at a negligent rate, he has no right to assume that it will slow down and approach the crossing at a careful rate.

It is true that Ramp says he never did see the other car, but it was there to be seen if he had looked in the direction the law requires him to look. He is bound by what he could have seen in the exercise of statutory diligence.

The law does not contemplate merely the injury likely to happen to one or the other or both of the drivers. In the great majority of automobile colli-

sions the safety of innocent third persons is at hazard. Hence arises the public policy of the enactment requiring the one on the left to look out and give the right of way to the one approaching from the right, at such speed that a collision is likely to occur if both proceed on their course. The law may punish both of them for infraction of its commands, but it will not award damages to one whose disobedience of its rules contributes to the unhappy result.

Many other precedents might be cited in support of the doctrine that a violation of the statutory rule is negligence *per se*. The statute required the plaintiff Ramp to "look out for and give right of way to vehicles on their right." That they were simultaneously approaching a given point, as the words of the statute phrase it, is demonstrated because they collided at that point. The plaintiff says he did not see the car, but he could have seen it if he had looked any time after he entered the highway. It is unthinkable that it came with such a swiftness that it could not be seen as if it were a rifle bullet, nor did it arise out of the ground. The Pacific Highway being one of the main arteries of travel in the country, as a duty to the public, motorists are required to maintain a lookout to the right, not in any fitful, intermittent way, but in a degree proportional to the danger involved. It is apparent that the plaintiff Ramp did not do this "for he himself hath said it." His obligation to his family and to others involved required just what he did not do, and by all the authorities he was guilty of contributory negligence, barring his recovery. The nonsuit against the plaintiff M. S. Ramp ought to have been allowed on this ground of his contributory negli-

gence. It matters not that. Osborne likewise was negligent, for the law will not undertake to apportion the consequences of negligence where both parties are to blame. No one can heedlessly place himself across the path even of a speed maniac without being himself guilty of contributory negligence. What is said here about M. S. Ramp's contributory negligence does not affect the cases of his wife and child, for one good reason that contributory negligence is not pleaded or urged as against them.

8. Exception was taken by all the defendants to the following instruction which the court gave to the jury:

"The right of precedence at an intersection of two highways given by law has no proper application except where the travelers or vehicles on the intersecting highways approach the crossing so nearly at the same time and at such rates of speed that if both proceeded, each without regard to the other, a collision or interference between them is to be reasonably apprehended. In such case it is the right of the one having the precedence to continue his course, and it is the duty of the other to yield to him the right of way. But if a traveler not having such right of precedence comes to the crossing and finds no one approaching it upon the other highway within such distance as to reasonably indicate danger of interference or collision, he is under no obligation to stop or to wait, but may proceed to use such crossing as a matter of right."

The instruction was probably sound up to the last sentence, but that part of it is defective in that it casts no duty upon the one not having the right of precedence. This instruction as given is copied from what was said *arguendo* in *Barnes* v. *Barnett,* 184 Iowa, 936 (169 N. W. 365). The court was there commenting upon an instruction of two para-

graphs given by the trial court, the second of which reads thus:

"But if the plaintiff, Barnes, in the exercise of ordinary care, believed, or if he, in the exercise of ordinary care, had the right to believe, that he could turn to the left on Ingersoll Avenue for the purpose of continuing his journey south on Thirty-Sixth Street, and could clear said intersection in safety, he was not required to stop and wait for an approaching motor vehicle, and his failure so to do would not constitute negligence, and if you so find the defendant would have no right of way over the plaintiff."

9. The court approved that instruction, and of course with it the element included therein that the plaintiffs must be in the exercise of ordinary care. The comment seized upon by the plaintiffs here ignores that element of the approved instruction which is essential to its validity. Looking where he ought not to look, ignoring his duty required by the statute, the plaintiff might well say that he found no one approaching him upon the highway. Under such circumstances, a party not looking where he was required to look cannot excuse himself as Lord Nelson did at the battle of Copenhagen by turning his blind eye upon the signal calling to him to retire and saying he did not see it. It is said in this connection that the plaintiff had a right to rely upon the defendant's observing the statutory rule against reckless driving. This obligation, like all other rules of the road, is mutual in its application. In order fully to realize the benefit of the presumption alluded to, the party invoking it must likewise observe the same rules. It is analogous to a railway crossing whereof we find this rule laid down in 22 R. C. L. 1040:

"One approaching a crossing has a right to assume
that the railway company will act with proper care,
and that all reasonable and necessary signals of the
approach of trains will be given; and in some juris-
dictions it is provided by statute that a want of
ordinary care will not bar a traveler in an action
for damages against a railroad company, when the
statutory signals are omitted. But the general rule
is that a traveler upon the highway approaching a
railroad crossing has no right to depend solely upon
any signals from a passing train, and must, in the
absence of such signals, still exercise reasonable care
for his safety, and endeavor to ascertain by looking
and listening the actual fact whether or not a train
is approaching, especially where his view is ob-
scured; and whenever the due use of either sense
would have enabled the injured person to escape
danger, his failure to use it is conclusive proof of neg-
ligence, without any reference to the company's fail-
ure to perform its duty."

10. The Adamic element in man impels him to
lay the blame on his adversary, but the law does not
always uphold him. Under the mutual obligation
of the law he cannot rely exclusively upon the pre-
sumption that the other man will obey it. He must
take reasonable care of his own concerns, and when
he himself does not obey the law, he likewise is
guilty of negligence preventing his recovery.

For the same reason the following instruction is
faulty:

"If two automobiles are approaching a highway
intersection under such circumstances that if each
proceeds to the intersection *without exceeding a
reasonable and lawful rate of speed* the one from the
left could first cross such intersection without danger
of a collision or interference with the other car, it
has the right so to do, *and under no circumstances,
if the automobile approaching from the right ap-*

*proaches said intersection at an unreasonable or unlawful rate of speed and because of such excessive and unlawful rate reaches said intersection at the same time as the other vehicle so that a collision results, it cannot be said that the one approaching from the left was guilty of negligence as a matter of law in attempting to first cross said intersection.''*

The mention of the reasonable and lawful rate or speed injects into the question an element not included in the clause of the statute relating to the right of way of crossings. It is true that reckless driving is forbidden by the statute; that a speed exceeding thirty miles per hour is unlawful, and that as in other cases of violation of the statute, such driving is negligence *per se,* but none the less, circumstances may arise where it would be grossest contributory negligence for one heedlessly to drive his car in front of a speed maniac. The instruction substantially declares that if there is present the condition that the one entitled to the right of way approaches the crossing at an unlawful rate, no other circumstance can arise upon which contributory negligence lawfully may be imputed to the other party. The rule announced in that part of the charge throws all the burden upon the defendants and practically directs the jury to disregard any conduct of the plaintiff contributing to his own injury.

11. The ground of attack upon Ross was that he was the owner of the car driven by Osborne at the time of the collision, which if true would make a *prima facie* case against him within the doctrine of *Houston* v. *Keats Auto Co.,* 85 Or. 125 (166 Pac. 531), *West* v. *Kern,* 88 Or. 247 (171 Pac. 413, 1050, L. R. A. 1918D, 920), *Dorothy* v. *Hazelwood Co.,* 90 Or. 475 (175 Pac. 849, 177 Pac. 432), *Clark* v. *Jones,* 91 Or. 455 (179 Pac. 272), *Rook* v. *Schultz,* 100 Or.

115 Or.—45

482 (198 Pac. 234), and *Sather* v. *Giaconi,* 110 Or. 433 (220 Pac. 740). It is not enough to prove owner-ship of the car at some time other than that of the collision for in the absence of contract no one can be held to guarantee the operation of a car after he ceases to own it. It may be possible that a new purchaser will inflict injury with a car within ten minutes after he drives it out of the store of the previous owner, and the latter, recent owner though he may be, would not be liable. However, we may view the testimony of the plaintiff respecting the ownership of the car, yet the testimony on behalf of the defendant Ross clearly indicates that he was the owner of the car up to the day of the accident, and the jury may well have regarded the testimony of him and Osborne about the matter as detailing mere negotiations for the passing of title, which were to be completed and closed up at some subsequent date. For instance, in Ross' cross-examination he was asked substantially if he would have claimed the car as his own in case it had been attached on the way to Portland as the property of Osborne and he answered in the affirmative. This testimony, although possibly objectionable under the rule in *Hughey* v. *Smith,* 65 Or. 323, 327 (133 Pac. 68), as not relating to a material fact but as calling for a speculative conclusion, was not objected to and under these circumstances was applicable on the question of whether the parties had intended to pass the title to the automobile before the happening of the accident. This was sufficient to cure possible short-comings in the plaintiff's case about ownership of the car and to take the case to the jury.

The court charged plainly for Ross that if the title had passed at the time of the accident he would

not be liable and likewise instructed on the question of Osborne using the car for his own purposes under the principle that he would be then a mere bailee of the car for whose negligence the bailor, Ross, was not liable: *Fisher* v. *Fletcher*, 191 Ind. 529, 133 N. E. 834, 22 A. L. R. 1392 and note. All that is decided here is that there was enough in the testimony to take the case to the jury as against Ross. Other assignments of error are either not necessary to this decision or not urged in the briefs and hence do not require treatment here.

The conclusion of the whole matter is that judgment of nonsuit is rendered against all the plaintiffs and in favor of the Oregon Rubber Company, and against the plaintiff M. S. Ramp in favor of all the defendants because of his contributory negligence in disobeying the statute requiring him to look to the right and give the right of way to a car approaching the crossing in such a manner that if they both continued on the course a collision would ensue. The judgments for the other plaintiffs are reversed because of errors in the admission of testimony and in charging the jury.

REVERSED.    REHEARING DENIED.

McBRIDE, C. J., and RAND and COSHOW, JJ., concur.