Argued March 6; reversed July 1, 1930

SCHRUNK *v.* HAWKINS ET AL.

(289 P. 1073)

*Oscar Hayter* of Dallas and *A. A. Hampson* of Portland (Dey, Hampson & Nelson of Portland and Jas. G. Heltzel of Salem, on the brief) for appellants.

*Henry E. Collier* and *Earl F. Bernard* both of Portland (Collier, Collier & Bernard and J. N. Helgerson, all of Portland, on the brief) for respondent.

ROSSMAN, J. The sole question argued before us is whether the instructions to the jury, quoted in the preceding statement of facts, was purely abstract without application to any evidence in this case, or whether the record revealed a situation which rendered it proper. Neither party contends that the instruction misstated the law, but as previously indicated the plaintiff insists that the instruction was not applicable to any situation disclosed by the record.

164

█ Stating to the jury abstract propositions of law which are not applicable in any way to the issues which they are to determine, and which may tend to draw their minds from the real facts, or intimate to them that the record supplies the facts governed by the instruction, is improper: *Geldard v. Marshall*, 47 Or. 271 (83 P. 867, 84 P. 803). But it is within the province of the presiding judge to instruct the jury upon the legal effect of all facts disclosed by the evidence: *State v. Jennings*, 131 Or. 455 (282 P. 560). Likewise he should instruct the jury with respect to the theories of the parties defined by the pleadings and supported by substantial evidence: *Lewis v. Craft*, 39 Or. 305 (64 P. 809); *West v. McDonald*, 64 Or. 203 (127 P. 784, 128 P. 818); *De Vol v. Citizens Bank*, 92 Or. 606 (179 P. 282, 181 P. 985); *Anderson v. Wallowa Nat. Bank*, 100 Or. 679 (198 P. 560); *Ramp v. Osborne*, 115 Or. 672 (239 P. 112).

We shall now review the portions of the evidence upon which the defendants rely in support of their contention that the instruction was material to a set of facts disclosed at the trial.

Main street in the city of Independence is a long, straight thoroughfare, 66 feet in width, and improved with a concrete pavement 16 feet wide, laid in the central portion of the roadbed. February 15, 1928, at 8:00 p. m., when this accident occurred, the night was very dark. One of the plaintiff's witnesses thus described it: "It was a very, very dark night, and I couldn't see anything"; other witnesses gave like testimony. The city street lights were of such small candle power that the illumination they afforded was of no consequence in this situation. At each street intersection one of these small street lamps was suspended from a pole 20 feet above the pavement. The manager of the power plant, which supplied the current for the

lights, testified that the lamps were ''equal to about 60 watts in the gas-filled or hydrogen-filled lights for domestic use,'' and added that they threw light ''I should say on a circle of 40 feet radius.'' One of the plaintiff's witnesses testified: ''It was very dark in between the two lights.'' The distance between lights was approximately 332 feet. The accident happened half way between two intersections. Large shade trees with spreading branches grew on both sides of the roadway and rain had fallen intermittently during the course of the evening. We deem the foregoing a sufficient review of the portions of the evidence which indicates that at the time and place of this accident Main street was a very dark place.

At 8:00 p. m. of February 15 one Gilbert Hoevet, whom the plaintiff alleged and the defendants denied was in the latter's employ, was riding a horse belonging to the defendants, northerly beyond the edge of the pavement on the east side of Main street. On his right-hand side was another horse which he was leading. These animals were draft horses, weighing between 1,700 and 1,800 pounds, bay colored. The branches of trees overhead hung so low that they frequently brushed the face of Hoevet and he, seeing on the opposite side of the road a place free from such obstructions, turned his horses to the left so as to cross the street diagonally. We now quote from his testimony:

''I had just started across the pavement when I saw this motorcycle coming around the corner * * *. at the bank building on Monmouth. * * * I thought I had plenty of time to cross the pavement and I kept on going across urging the horses along * * * just as the horse I was riding left the pavement the other was just ready to leave the pavement when the motorcycle hit the horse.''

Monmouth street was 1,400 feet north of the place where Hoevet crossed Main street. The witness testified that the horses had worked that day, were tired and walked slowly. According to his testimony his course in crossing the street, advanced him northerly approximately 30 feet in addition to the 16 feet west. When the horses had reached a point approximately three-fourths of the way across the pavement the beam of light, projected by the lamp of the motorcycle, shown on them; at that time the latter vehicle was about 25 feet distant. Hoevet attempted to attract the plaintiff's attention by yelling and waving his hand, but without avail. The plaintiff testified that he was travelling close to the west edge of the pavement, and that the ''horse just loomed up in the light and I tried to miss the horse.'' He described the collision thus: ''All at once I saw a horse on the pavement and swerved and just missed it, and I just kind of give a sigh of relief and kind of went to sleep I guess, and I guess I hit the other horse; I missed the one horse on the edge of the pavement and hit the other horse.'' He estimated that the brakes upon his motorcycle could stop it within 50 feet when proceeding at a rate of 20 miles per hour. However, he made no effort to stop. He testified that the horse with which he collided was on his side of the roadway travelling towards him close to the edge of the paved portion of the street. We bring to a close our review of this portion of the evidence by stating that it clearly showed that the accident occurred near the west edge of the pavement. Substantial evidence indicated that one of the horses was completely off of the pavement and that the one which was struck was partially off of it.

We come now to the portion of the evidence which shows the speed of the motorcycle as it approached

the place of the collision, and also the pace of the horses. While the uncontradicted testimony shows that the horses were travelling no faster than a walk the record contains substantial evidence indicating that the plaintiff's speed was as high as "at least 35 miles per hour." The plaintiff estimated his speed at 20 miles per hour.

The testimony concerning the lights upon the motorcycle came exclusively from the plaintiff. He testified that he had two headlamps fastened to the handle bars and that they showed a distance of "oh, about 25, anywhere between 30 or 40 feet." Later he added: "I imagine the motorcycle would show about 40 feet ahead, that is the ray of the light." He was then asked: "But the motorcycle lights would show up and reveal to you a substantial object, like a horse we will say, a distance of about 40 feet ahead of you?" "A. Forty or fifty feet." "Q. And such an object would not be revealed to you any greater distance than that ahead?" "A. No, I don't think so." His testimony and that of others indicated that the beam of light spread over approximately one-half the width of the pavement. The plaintiff did not see the rider upon the horse nor did he see more than one horse.

The testimony varied as to the plaintiff's course as he approached the place of the accident. He insisted that he drove near to the west edge of the paved portion of the street. One of the defendants' witnesses described the plaintiff's course thus: "down the center of the pavement somewhere near the center"; Hoevet testified: "he kept working back and forth across the pavement from the center of the pavement to the sides, sometimes near the edge and sometimes near the center."

Our motor vehicle law requires that motorcycles shall be thus equipped: "shall have a front lamp or front lamps capable of furnishing sufficient illumination to render clearly discernible any substantial object 140 feet directly ahead and any substantial object 70 feet ahead and five feet to the right of the axis of the motorcycle": 1925 Session Laws, ch. 323, p. 651.

██ Statutory provisions requiring motor vehicles to possess lighting equipment are interpreted in as practical a manner as possible so as to render effective the purposes they seek to serve: *Brenne v. Hecox,* 129 Or. 210 (277 P. 99); *Thomas v. Stevenson,* 146 Minn. 272 (178 N. W. 1021). The lighting equipment is intended to facilitate the safety of not only the car displaying it but also of all others who are using the thoroughfare: *Curran v. Lorch,* 247 Pa. 429 (93 Atl. 492), including those who are approaching from an intersection street: *Thomas v. Stevenson,* supra.

The plaintiff's argument in support of the order of the circuit court, holding inapplicable the instruction to the jury previously quoted, adopts the same conception of the facts as were held by the judge of that court. We quote again from his memorandum: "I think from the testimony that it is undisputed that the horses came into the range of the lights approximately 20 or 25 feet ahead of the motorcycle, and this being so, even though the lights would show an object only 40 or 50 feet ahead, as Schrunk testified they would, and therefore were defective, yet this could not have been a proximate cause of the collision, and I think any alleged act of negligence which the testimony does not show to have been a proximate cause of the injury should not be submitted to the jury."

██ We are unable to concur in that conclusion. It may be true that a dim light, capable of illuminating the

roadway for a space of only 40 or 50 feet ahead, would not reveal the horses until the motorcycle was within 20 or 25 feet of them, but a light of the type required by our laws, furnishing sufficient illumination to render clearly discernible any substantial object 140 feet ahead, would certainly have revealed two bulky horses approximately 140 feet before the motorcycle reached them. We have not forgotten that the horses were crossing the roadway; but we bear in mind that their course was not at right angles to the edges of the pavement, nor did they gallop suddenly into the rays of light. The undisputed testimony is in harmony with Hoevet's language that he ''catercornered'' across the street, and was proceeding at a walk's pace. In fact, the movement of the horses was so slow that the plaintiff was not sure whether they were in motion. Under these circumstances it was for the jury to determine whether a light of the type required by our laws would have revealed the horses in time to be effective.

■ ■ The fact that the motor vehicle act provides that the lights should be capable of revealing ''any substantial object 70 feet ahead and five feet to the right,'' but makes no provision for illumination to the left, does not necessarily indicate that the plaintiff should be excused from having seen the horses if the one he struck was to the left of the axis of his course as he proceeded along his way. We have mentioned the evidence which indicates that the plaintiff's course was an irregular one, weaving from side to side of the pavement. Under such circumstances the instruction was proper even though one should believe that by inference the act prohibits the motorcycle operator from casting any rays of light to his left. But we do not believe that the legislature intended that the

headlight should send forth a beam of light over a triangular area only, five feet wide at its base and 70 feet long. A motorcycle is in a constant state of vibration when in motion and such a result would, therefore, be practically impossible. The language of our act, which has already been quoted, is followed with: "The lights of all vehicles shall be so arranged, adjusted and operated as to avoid dangerous glare or dazzle." It was for the jury to determine whether a motorcycle light, which did not infringe upon the prohibitions of the statute, but yet complied with its positive requirements, would have revealed these horses had their position and movement upon the pavement been as described by the testimony which we have previously mentioned. We believe that the instruction was required by the theory advanced by the defendants. Since their theory was supported by competent, substantial evidence the court was justified in the instruction which it gave to the jury, and erred when it ordered a new trial.

Being of the opinion that the court erred when it deprived the defendants of their judgment and awarded a new trial, the order appealed from will be reversed.

COSHOW, C. J., McBRIDE and RAND, JJ., concur.